DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

RYAN REZAEI (CABN 285133)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7534
    FAX: (415) 436-7234
    ryan.rezaei@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>     Plaintiff, <br>   v. <br> EDUARDO ALFONSO VIERA-CHIRINOS, <br>     a/k/a "Rojo," <br>     Defendant. | CASE NO. 19-CR-367 CRB <br><br> **UNITED STATES' BRIEF REGARDING DETENTION** |

      The defendant should not be released from custody under any circumstances. He has killed two people. He was caught on a wiretap coordinating a third murder. Not only is he a murderer, he was the leader of a drug trafficking organization that peddled large amounts of drugs—from heroin to cocaine base—in San Francisco. His organization provided housing to numerous street-level dealers; these street-level dealers were required to pay rent to the organization and sell drugs on its behalf. The defendant himself was caught with kilograms of drugs, and right after that, he was captured on the wiretap trying to obtain passports for his family so they could escape to Honduras; the only thing that prevented his escape was his arrest. The drug trafficking organization which he headed was a family affair involving his brothers and nephew and also the mother of his children. Multiple members carried

guns. If any defendant in this case—there are 15 total—and all related cases belongs in jail, this defendant is undoubtedly the one.

## I. BACKGROUND

### A. The defendant's crimes and violence

The defendant and his co-defendants were initially charged in a 94-page complaint, which the government incorporates herein. Dkt. 1 (Complaint). As set forth in the complaint, the defendant, his brothers and nephew, and the mother of his children, ran a drug trafficking organization which distributed drugs, including heroin, cocaine, cocaine base, and methamphetamine, in San Francisco. The organization supplied street-level dealers with these drugs and provided housing to them; up to ten men lived in each residence, sometimes with their partners and children. The street-level dealers were required to pay the organization rent, and could only live in a residence if they agreed to sell the organization's drugs. *Id.* at ¶¶ 15-24.

The organization was a particularly violent one. The defendant himself was captured on the wiretap discussing guns and how there is someone who "legalizes guns" for him. Dkt. 1 (Complaint), ¶¶ 187-88. The defendant discussed a rifle (one that looks like an "AK") and a pistol ("40 Beretta"). *Id.* The defendant said the magazine took 15 and that he had another one with 25. *Id.* The defendant said, "people get scared just by looking at them." *Id.*

During the investigation, the defendant was caught on the wiretap not only discussing guns but also a planned hit. The complaint includes the defendant's communications about the planned hit. Dkt. 1 (Complaint), ¶¶ 189-204. Relevant excerpts include the following:

**Dkt. 1 (Complaint), ¶ 195**

195.  Later, the two men said:

| | |
|---|---|
| EDUARDO | If you can, if you can go now, buddy. If you can, buddy, you get me? Well, if he comes out good and if he does not, you can go pick up the other thing. Yeah. |
| UM-9629 | For sure, for sure. The house is far and you cannot do it there. |
| EDUARDO | It is there close to the middle of downtown [sniffles]. |
| UM-9629 | Right in the middle of downtown. Yeah... |
| [Voices overlap] | |
| EDUARDO | Yeah, it is right in the middle of downtown and right there only if you go in through my cousins, going towards the fence and you shoot him, but right there might be problems because it would come from my cousin's house. It would be too obvious. |

**Dkt. 1 (Complaint), ¶ 191**

| | |
|---|---|
| EDUARDO | The only problem is that the bullets, you get me? My brother-in-law already has the R ready, you get me? Everything is ready. The "peines" are ready and everything else but not the bullets. I cannot find them. I only have sixty (60) animals of "peines". |
| UM-9629 | Wow. |
| EDUARDO | I have three (3) "peines" but only two (2) are full, you get me? Then other one is empty. |
| UM-9629 | It is empty. Well, those animals had to be used with enough bullets. You get me? |
| [Voices overlap] | |
| EDUARDO | Yes. |
| UM-9629 | [U/I] new ones to not mess up. |
| EDUARDO | Yeah, so they do not mess up. |

> **Dkt. 1 (Complaint), ¶ 193**
>
> 193.   The call continued:
>
> EDUARDO   That is the only problem. Listen, right there there are two (2) guys and right now another one is coming right now. Another guy is coming, you get me? Those three (3) guys can cover the hill, you get me? If you come over with another guy and with Mario. You can cover the other exit, by Quema Sombrero (Orica, Honduras). The exit by El Naranjo. These are the only two (2) exits. That guy is not going to come out right now. The guy will come out at night or early morning.

> **Dkt. 1 (Complaint), ¶ 197**
>
> 197.   Later, the two men said:
>
> EDUARDO   What I am telling you is to take advantage if you can. Sometimes things to come out good out of the blue. You get me? We know that [U/I] the son of a bitch and that way you can go get your rifle.
>
> UM-9629   Sometimes things one get things that come out of the blue. They come out of nowhere.
>
> [Voices overlap]
>
> EDUARDO   All of the, all of the sudden.
>
> UM-9629   [U/I].
>
> EDUARDO   I have, I have gotten rid of two enemies like that, all of the sudden. Something that it is not planned and it has gotten done easily.

This last excerpt is especially notable. In it, the defendant admits he killed two of his enemies the same way—by carrying out a surprise attack "out of the blue."

　　The rest of the defendant's family was equally violent. This is evidenced not just by the intercepted communications mentioned above—for instance, the defendant mentions his cousin and

brother-in-law in the planning of the murder—but other intercepted communications as well. For example, the defendant's brother and co-defendant, Jorge, attempted to obtain firearms in connection with violence he (Jorge) intended to carry out the next day. *See* Dkt. 1 (Complaint), ¶¶ 180-85 (Jorge discussing the acquisition of a "nine and a forty"—in other words, nine millimeter and .40 caliber firearms—so they can "do that thing tomorrow").

The violence just scratches the surface of the defendant's crimes: he was the leader of a drug trafficking organization. As set forth in the complaint, there were two significant seizures in this case. The defendant was involved with both. First, in June 2018, law enforcement searched a house in Richmond. In a modified air compressor, there was 1,173.7 gross grams of methamphetamine, 718.6 gross grams of heroin, 467 gross grams of cocaine base, 168.9 gross grams of cocaine powder, and $73,118 in cash. On top of the drugs and cash was a white paper towel. "Rojo," which is the defendant's alias, and "Karen," who is the mother of his children and co-defendant, were written on the paper towel. Karen had rented the residence. Dkt. 1 (Complaint), ¶¶ 27-36. Following this seizure, the defendant and Karen fled to Seattle. (The defendant told pretrial services he lived in Seattle the year prior to his arrest. Of course, the defendant failed to explain to pretrial services *why* he moved to Seattle in the first place—to flee the police. *See* Dkt. 1 (Complaint), ¶ 85.)

Later, on July 22, 2019, the defendant was in a truck with a co-defendant; they were stopped by local authorities in Washington State. Inside the truck, in a hidden compartment, authorities found two cylindrical packages and seven cellophane-wrapped packages. The packages contained 1,400.8 grams of heroin and 1,986.1 grams of cocaine. Dkt. 1 (Complaint), ¶¶ 258-64. Following the stop, the defendant was caught on the wiretap stating, "We are fucked. We are fucked." *Id.* at ¶ 265. Eduardo later told Karen that there have been "so many things" we have lost and that "last time it was about 80 cash and today about 24 on top of work." *Id.* at ¶ 276. Law enforcement believes the "80 cash" was a reference to the nearly $80,000 that law enforcement seized in June 2018, and that "work" was code for the drugs seized on July 22. *Id.* at ¶ 277.

This only begins to describe the scope of the defendant's criminal activity. His organization distributed all types of drugs for years in San Francisco, as described more fully in the complaint. *See* Dkt. 1 (Complaint).

B. **The defendant's attempt to flee the country**

Following the seizure on July 22, 2019, the defendant was caught on the wiretap speaking with Karen Castro-Torres—the mother of his children and co-defendant—about getting passports for their children. These communications are summarized more fully in the government's Motion to Detain Karen Castro-Torres. Dkt. 32, pp. 5-14. Relevant excerpts follow:

*Dkt. 32 (Motion to Detain Karen), pp. 6-7*

| | |
|---|---|
| EDUARDO | …but, um-hum, you can do that with a reservation, but in order to do that, **I have to send for some papers that I left in Washington, and then I can give Karen authorization so she can take out a passport without me. So she can get the boy's passport.** |
| UF6684 | Um-hum. |
| EDUARDO | We need to get that first. |
| UF6684 | So then, so then, so then, **I will talk Ada so that [U/I] can be done [U/I], because she [U/I] because the ticket's price for her is one-thousand two-hundred (1,200).** |
| EDUARDO | Um-hum. |
| UF6684 | **The little girl will cost you six-hundred (600) but… hers would be one-thousand two-hundred (1,200). So then, fifteen (15) days, more or less** [Pause]. **What do you think about fifteen (15) days?** |

*Dkt. 32 (Motion to Detain Karen), p. 7*

| | |
|---|---|
| EDUARDO | What did you say? |
| UF6684 | **That, that fifteen (15) days… what do you think?** |
| EDUARDO | **I think yes, that's fine.** |
| UF6684 | Oh, good, so then, I will call her and tell her that in about fifteen (15) days. |
| EDUARDO | Yeah, so… like try to… find something comfortable for, for a couple of days, so they can have a chance to take out [U/I]… because with, with, **with the ticket in hand, the, the passport can be obtained right away as an emergency.** |
| UF6684 | Oh, all right, then. |

The defendant was particularly concerned about law enforcement detecting his escape efforts, stating the

following about "dirty" numbers and obtaining new ones:

*Dkt. 32 (Motion to Detain Karen), p. 7*

| EDUARDO | It's because I don't have that number anymore, Norma [PH] and, and I will send you… I am going to call you to, so that you, so that |
|---|---|
| | you can go buy a number, so that only we can communicate because the other ones are dirty. [U/I] is what I am saying. |

C.   **The defendant's ties to Honduras and his lack of employment history**

As set forth in the pretrial services report, the defendant's parents and some of his siblings reside in Honduras. His children are there as well. His ties to Honduras are strong. In fact, as mentioned, he was trying to escape with his family to that country immediately following the July 22, 2019, seizure. His arrest was the only thing that stopped him. And a note about the defendant's father: as set forth in the complaint, the defendant was intending to rely in part on his father to obtain bullets for the gun that was going to be used in the planned hit. The following is an excerpt from the defendant's communications relating to the planned hit:

> 199.   Later, the two men said:
>
> UM-9629      Let's do something, let's do something. Well, I'm here but if for some reason that doesn't happened, I will poke the [U/I] too if you would like.
>
> EDUARDO     For sure. Go ahead, go ahead. You got it. Take the rifle, man, you are going to use it, you get me?
>
> UM-9629      Yeah, I am going to go with a friend and another guy, you get me? And you know that [U/I] over there.
>
> [Voices overlap]
>
> EDUARDO     Listen, listen, I am going to call my dad right now and I am going to call my, I am going to call three other contacts to ask them to have those bullets no matter what, otherwise I am going to get them from their loins, you get me?

Dkt. 1 (Complaint), ¶ 199.

The defendant also reported to pretrial services that he worked in construction. This just does not appear to be true. He was a drug dealer; that was his profession. In fact, not once on the wiretap was he caught discussing any type of employment, let alone a job in construction.

This defendant is also an illegal alien and was previously deported from the country. He is not a rule-follower, as demonstrated by his immigration violations and other extensive criminal activity.

## II.  ARGUMENT

The defendant should not be released under any circumstances. He is a drug-dealing murderer. He is also a very serious risk of flight. He is facing not less than 10 years in prison based on the crimes charged and given that he is not safety valve eligible—because he was a leader within the organization—and his anticipated guidelines far exceed the 10-year mandatory minimum term.

### A.  Legal standards

Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(B). A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *Motamedi*, 767 F.2d at 1406.

Where, as here, there is probable cause to believe that the defendant committed an offense under 21 U.S.C. § 846, there exists a rebuttable presumption that "no condition or combination of conditions of release will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e). Even when rebutted, however, the presumption does not disappear; it still carries evidentiary weight. "The presumption is not erased when a defendant proffers evidence to rebut it; rather the presumption remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)." *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (internal quotations and citation omitted).

The Court must consider four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or

alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986). "[T]he Bail Reform Act mandates an [1] individualized evaluation [2] guided by the factors articulated in § 3142(g)." *Diaz-Hernandez*, 943 F.3d at 1199.

Under 18 U.S.C. § 3142(i), a judicial order may "permit the temporary release" of a defendant "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." The government bears the ultimate burden of persuasion to detain pretrial. *Hir*, 517 F.3d at 1087. However, once a defendant is ordered detained, it is the defendant who must show that temporary release is necessary under Section 3142(i). *United States v. Dupree*, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011). Courts considering whether pretrial release is necessary for a person's defense under this section have considered: "(1) the time and opportunity the defendant has to prepare for the trial and participate in his defense, (2) the complexity of the case and volume of information, and (3) expense and inconvenience associated with preparing while incarcerated." *United States v. Cecrle*, 2014 WL 31674, at *4 (D. Nev. Jan. 3, 2014) (citing district court cases). A defendant has constitutional rights to assistance of counsel and meaningful access to courts. *United States v. Wilson*, 690 F.2d 1267, 1271 (9th Cir. 1982). But there are numerous "constitutionally permissible means of achieving" those objectives. See id. at 1271 (discussing access to courts); *see also United States v. Robinson*, 913 F.2d 712, 717 (9th Cir. 1990) (explaining that defendant who had waived right to counsel could not complain about limited access to legal materials). "While prisoners have a general right to consult with their legal counsel, that right is not absolute . . . ." *McMaster v. Pung*, 984 F.2d 948, 953 (8th Cir. 1993) (finding ban on contact visits with one of defendant's attorney, and limitation to "telephonic contact and consultation through the mails" did not violate defendant's Sixth Amendment rights); *see Geders v. United States*, 425 U.S. 80, 88–89 (1976) (finding that defendant could not be banned from consulting with attorney during 17-hour overnight trial recess, but "we do not deal with limitations imposed in other circumstances"). A defendant's access to his or her attorney may be burdened by regulation or practice of his penal institution, if justified by

legitimate interests of penal administration. *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1052 (8th Cir. 1989).

### B. Defendant remains a flight risk and danger to the community

The defendant is a danger to the community in the truest sense. He is responsible for at least two killings and was caught on the wiretap coordinating a third murder. He ran an organization that was responsible for dealing large amounts of drugs in San Francisco. And he was committing his crimes not because he was addicted to drugs, but because he wanted to make money. He is an illegal alien who was deported previously and was actively trying to escape the country with his family right after he was caught with heroin and cocaine; in fact, the defendant has already accomplished one part of his escape plan—getting his children to Honduras. And the defendant has already fled from law enforcement once before, in about June of 2018, when his drug stash and cash was seized by law enforcement in Richmond. The defendant is a killer and was the kingpin of a 15-member drug trafficking organization. He belongs behind bars, not free on bail where he will commit more crimes.

The proposed surety and custodian is not suitable, either. She reported to pretrial services that she has been involved with the defendant for the last three years. Of course, during that time, the defendant was busy dealing drugs and coordinating murders. The proposed surety and custodian was either privy to the information and did nothing, or she did not know about it in the first place. Either way, she is not a suitable custodian or surety.

There are no conditions or combination of conditions that reasonably mitigate defendant's risk of flight or dangerousness to the community. This Court should order that defendant remain in custody, just as numerous magistrate judges have denied similar motions for pretrial release, including those brought by defendants with underlying medical conditions. *See, e.g.*, *United States v. Reynolds*, 18-CR-158 JD (SK), Dkt. 108 (N.D. Cal.) (detaining defendant pending trial identified as medically vulnerable to COVID-19 by Santa Rita on the basis of danger); *United States v. Batiste*, 16-CR-278 CRB (JCS), Dkt. 63 (N.D. Cal) (denying motion for release based on COVID-19 of defendant with heart and lung damage on the basis of danger, insufficient information regarding medical condition and inadequate release plan); *United States v. McHale*, 19-CR-526 WHO (JCS), Dkt. 48 (N.D. Cal.) (denying motion for release based on COVID-19 of diabetic defendant who had bond revoked and had poor pre-trial

release record); *United States v. Sanchez*, No 19-CR-576 VC (JSC), Dkt. 23 (N.D. Cal.) (denying motion for release of defendant on the basis of danger and rejecting proposal that he live with mother because he had previously been living with them while committing his offenses); *United States v. Traore*, No. 20-CR-029-VC (JSC), Dkt. 28 (N.D. Cal.); *United States v. Campos*, No. 19-CR-0280-RS (JSC), Dkt. 95 (N.D. Cal.); *but see In the Matter of the Extradition of Alejandro Toledo Manrique*, No. 19-mj-71055-MAG-1 (TSH), Dkt. 115 (N.D. Cal.) (granting motion for release premised on COVID-19 concern in extradition proceeding, with different standards for release than under the Bail Reform Act, where defendant was more than 70 years old); *United States v. Garcha*, No. 19-cr-00663-EJD-1 (VKD), Dkt. 26 (Apr. 1, 2020) (denying relief under § 3142(f) but granting temporary release under 18 U.S.C. § 3142(i) where the defendant's "individual circumstances—a compromised immune system [due to HIV] and lung damage due to a pulmonary embolism—render him particularly susceptible to infection from the COVID-19 virus while in custody and particularly at risk of severe illness or death as a result of such infection").

### III. CONCLUSION

The defendant belongs in jail. No conditions can assure the safety of the community or secure his appearance as required.

DATED: April 22, 2020

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

         /S/
RYAN REZAEI
Assistant United States Attorney